DISCIPLINARY COUNSEL *v.* BUBNA.

[Cite as *Disciplinary Counsel v. Bubna,*
116 Ohio St.3d 294, 2007-Ohio-6436.]

(No. 2007–1115—Submitted September 12, 2007—Decided December 12, 2007.)

---

**Per Curiam.**

{¶ 1} Respondent, Walter Peter Bubna of Parma, Ohio, Attorney Registration No. 0017928, was admitted to the practice of law in Ohio in 1980.

{¶ 2} The Board of Commissioners on Grievances and Discipline recommends that we suspend respondent's license to practice for one year, staying the last six months on conditions, based on findings that he (1) commingled his and clients' funds in the same bank account, (2) failed to keep records of client funds in the account, and (3) sometimes overdrew the account, preventing him from paying sums to which a client was entitled. On review, we agree that respondent violated the Code of Professional Responsibility as found by the board and that a one-year suspension, partially stayed on conditions, is appropriate.

{¶ 3} Relator, Disciplinary Counsel, charged respondent with violations of DR 1–102(A)(6) (a lawyer shall not engage in conduct that adversely reflects on his fitness to practice law), 6–101(A)(3) (a lawyer shall not neglect an entrusted legal matter), 9–102(A) (all funds of clients paid to a lawyer shall be deposited in one or more identifiable bank accounts, and no funds belonging to the lawyer or law firm shall be deposited therein), and 9–102(B)(3) (a lawyer shall maintain complete records of all funds, securities, and other property of a client in the lawyer's possession and render appropriate accounts to his client). A panel of the board heard the cause, including respondent's stipulations to the charged misconduct, made findings of fact and conclusions of law, and recommended the one-year suspension and six-month stay. The board adopted the panel's findings of misconduct and recommendation.

{¶ 4} Neither party has objected to the board's report.

Misconduct

{¶ 5} From approximately 1998 until May 31, 2006, respondent did not maintain either a personal or business checking account. He instead kept his personal funds and funds for his law practice's operating expenses in his trust account with his clients' funds.

{¶ 6} During the same period, respondent wrote checks drawn on his trust account to pay his clients and to pay his business and personal expenses, never keeping track of the withdrawals and deposits or to whom various sums belonged. As a result, respondent repeatedly overdrew his trust account, incurring overdraft and other bank charges. Respondent admitted that he mismanaged his trust account and that he several times used clients' money for his own or business purposes.

{¶ 7} Respondent also admitted that he promised but failed to pay claims arising from a client's medical expenses in a personal-injury case. In December 2002, respondent negotiated a $7,500 personal-injury settlement for Brent White, a client whose family respondent had represented for years. That same month, respondent deposited the settlement check in his trust account and wrote White a $3,000 check from the account as a partial distribution of the proceeds. Respondent kept $1,500 as his fee and retained another $3,000 to pay an insurer's subrogation claim for medical costs it had paid.

{¶ 8} Between October 2003 and March 2005, while supposedly safekeeping the White settlement proceeds and funds belonging to at least two other clients, respondent overdrew his trust account on multiple occasions. Before July 7, 2004, respondent also paid personal expenses from his trust account and borrowed $19,000 from his parents to deposit in the account. He kept no records of transactions in the trust account.

{¶ 9} Respondent never paid the claims for White's medical expenses, and in the year after the settlement, White began receiving collection notices. White repeatedly called respondent, asking for an explanation, but respondent returned his calls only while White was at work. Respondent later admitted to White that he had not paid the outstanding subrogation claim, yet even then, he did not arrange for payment. In January 2004, respondent instead sent White a $1,835 check.

{¶ 10} In April 2004, White tried to cash the $1,835 check. The bank honored the check only after obtaining respondent's specific permission. Respondent also sent White a second check for $1,165, attempting to return the rest of the $3,000 sum that he had retained from White's settlement. This time, the bank refused to honor the check, citing insufficient funds in respondent's trust account. Not until July 2004, after White filed his grievance with relator, did respondent make

good the $1,165 check, giving White a money order for that amount plus $60 more to pay for his client's inconvenience.

{¶ 11} Respondent stipulated and we find that he violated DR 1–102(A)(6), 6–101(A)(3), 9–102(A), and 9–102(B)(3).

## Sanction

{¶ 12} In determining the appropriate sanction to impose for attorney misconduct, "we consider the duties violated, the actual or potential injury caused, the attorney's mental state, the existence of aggravating or mitigating circumstances, and sanctions imposed in similar cases." *Stark Cty. Bar Assn. v. Ake,* 111 Ohio St.3d 266, 2006-Ohio-5704, 855 N.E.2d 1206, ¶ 44. We must weigh the aggravating and mitigating factors. See Section 10(B) of the Rules and Regulations Governing Procedure on Complaints and Hearings Before the Board of Commissioners on Grievances and Discipline ("BCGD Proc.Reg."). We are not limited to the factors specified in the rule and may take into account "all relevant factors" in determining which sanction to impose. BCGD Proc.Reg. 10(B).

{¶ 13} Respondent knowingly breached his duties as a lawyer to conscientiously attend to a client's interests and to segregate, account for, and protect client funds in his possession. Respondent's delay in paying White's insurer adversely affected White's credit and required him to repeatedly fend off collection efforts.

{¶ 14} As mitigation, respondent expressed his sincere remorse for his wrongdoing, at one point becoming visibly emotional. He explained that his troubles had begun around 1998, when the Internal Revenue Service ("IRS") garnished all the funds in his office business account. Afterward, respondent started handling his office and personal finances through his trust account, which he continued to do even after resolving the tax deficiency.

{¶ 15} Respondent claimed that he had little client money in his trust account because he was seldom paid in advance. He conceded, however, that he had accepted fees in advance.

{¶ 16} Also in mitigation, respondent proved his good character and that he worked pro bono for his church. See BCGD Proc.Reg. 10(B)(2)(e). Respondent has no prior disciplinary history. See BCGD Proc.Reg. 10(B)(2)(a). Moreover, respondent cooperated in the disciplinary process, see BCGD Proc.Reg. 10(B)(2)(d), and has made full restitution.

{¶ 17} Aggravating considerations, however, weigh against these factors and support the recommendation for a suspension stayed only in part. Though respondent now has separate bank accounts to properly segregate his client's funds, he acted with little urgency in setting up those accounts. Nearly one year after White's June 2004 grievance, respondent still had not set up a business

bank account, and in a letter to relator's counsel, he could only predict that he would have one within three weeks.

{¶ 18} Respondent did not actually open a business account until May 31, 2006, almost two years after the grievance filed against him. To compound this delay, he continued to allow two personal creditors to deduct payments from the trust account as late as August 2006. One personal creditor still had access to his trust account on May 11, 2007, the date of the panel hearing.

{¶ 19} Respondent also showed little appreciation for why the rule against commingling exists. Rather than acknowledging the risk his lack of proper accounting practices posed to clients, respondent lamented that he did not always adequately collect for his services and should have been more aggressive in collecting fees from clients. The board took these remarks to mean that respondent regretted not so much that he commingled funds as that he had not collected enough from his clients to cover his improper withdrawals from the trust account with his own money.

{¶ 20} Nor could the board attribute respondent's poor bookkeeping practices completely to his claims of naivety. Respondent has been a sole practitioner since 1982, and before his IRS problems, he had maintained a trust account and had separated client funds from his personal or business funds. (He commingled the funds to avoid further garnishment.) Moreover, respondent's bookkeeping records were not merely in disarray or incomplete—they simply did not exist.

{¶ 21} Finally, respondent showed little regard for the problems he caused by delaying payment for White's medical bills. Respondent first did nothing for approximately one year to make payment, and he then evaded his client's legitimate inquiries for seven more months. Respondent repaid his client's trust with broken promises and dishonored checks, all while using White's money as his own. Yet at the panel hearing, respondent testified that he had given White a "break" by accepting approximately $1,000 less than he had agreed in fees and that he had forgiven his client for filing a grievance.

{¶ 22} We therefore agree with the board that respondent acted in his own interests rather than those of his clients, that he committed multiple offenses, and that he has little appreciation for the extent of his misdeeds, conduct that constitutes aggravating factors. See BCGD Proc.Reg. 10(B)(1)(b), (d), and (g).

{¶ 23} As to precedent, the board aptly observed:

{¶ 24} "The prevailing attitude of the Supreme Court is * * * accurately reflected in the opinion in *Dayton Bar Assn. v. Gerren,* 103 Ohio St.3d 21, 2004-Ohio-4110, [812 N.E.2d 1280]. In *Gerren,* the Respondent was an attorney of long standing who, like Mr. Bubna, escrowed part of a personal injury settlement for payment of medical bills. Unlike Mr. Bubna, Mr. Gerren actually paid all but

one of his client's outstanding bills, the exception being a large bill owed to Franciscan Medical Center. As to that bill, Gerren had almost settled the claim when Franciscan experienced its own financial problems and negotiations broke off. After this, Gerren got into financial trouble of his own and spent some of the funds that were to have been paid to Franciscan such that when the discussions regarding payment resumed, Gerren no longer had the money.

{¶ 25} "In its opinion the Supreme Court noted Gerren's remorse, his good character and standing in the community and the lack of any prior disciplinary history. Notwithstanding all of these factors this Respondent was given a six month suspension."

{¶ 26} In *Dayton Bar Assn. v. Gerren*, 103 Ohio St.3d 21, 2004-Ohio-4110, 812 N.E.2d 1280, ¶ 14, we admonished:

{¶ 27} "Misappropriation of a client's money cannot be tolerated, and it is immaterial whether the amount at stake is large or small, to be paid to the client, or applied to pay a client's debt. The presumptive disciplinary measure for acts of misappropriation is disbarment. *Disciplinary Counsel v. France*, 97 Ohio St.3d 240, 2002-Ohio-5945, 778 N.E.2d 573, ¶ 11, although this sanction may be tempered with sufficient evidence of mitigating or extenuating circumstances * * *. *Disciplinary Counsel v. Smith*, 101 Ohio St.3d 27, 2003-Ohio-6623, 800 N.E.2d 1129."

{¶ 28} Disbarment is unwarranted here in view of the mitigating factors. The parties' proposed one-year suspension, all stayed on conditions, is too lenient. Given the many years that respondent used his trust account for improper purposes, his failure to promptly reimburse a client for missing funds, and his attitude toward the victim of his misconduct, an actual suspension is required. Consistent with *Gerren*, a one-year suspension with a six-month stay is appropriate.

{¶ 29} We therefore suspend respondent from the practice of law in Ohio for one year; however, we stay the last six months of this suspension on the conditions that respondent (1) commit no further misconduct, (2) complete a five-hour course in law office management in addition to the continuing legal education required by Gov.Bar R. X(3)(G), and (3) if reinstated to practice, serve a one-year probation period, including compliance with monitoring procedures under Gov.Bar R. V(9)(B). If respondent fails to comply with the conditions of the stay or probation, the stay will be lifted, and respondent shall serve the entire one-year suspension. Costs are taxed to respondent.

Judgment accordingly.

MOYER, C.J., and PFEIFER, LUNDBERG STRATTON, O'CONNOR, O'DONNELL, LANZINGER, and CUPP, JJ., concur.

Jonathan E. Coughlan, Disciplinary Counsel, and Philip A. King, Assistant Disciplinary Counsel, for relator.

Dianna M. Anelli, for respondent.